BARNARD ADAMS, & CO., VS. WM. D. MOSELEY, RECEIVER, ET AL.

An arrangement made by a surety, under and by virtue of which property mort-
gaged was left in the hands and subject to the control and management of
the debtors, with the intent that by the rents, issues and profits they might
diminish or pay off and discharge the mortgage debt for which the surety
was bound, and thus save the property from sale at a time when it was sup-
posed, if offered, it would be sacrificed, is not fraudulent, as tending to " de-
lay, hinder, or defeat creditors." Nor is such an arrangement fraudulent,
though made after a decree of foreclosure has been rendered, and an order
of sale made, by which the surety was directed to take possession of the
mortgaged property, as receiver and commissioner, and to sell, as he might
be required by the creditor, and apply the proceeds to the payment and ex-
tinguishment of the mortgage debt.

On the 17th day of July, 1847, Charles Barnard, Abel Adams,
George M. Barnard and Charles Larkins, merchants, trading as
Barnard, Adams & Co., filed their bill for relief and discovery in the
Circuit Court of Jefferson County, against William D. Moseley,
Daniel S. Graham, George W. Gelzer and William J. Bailey, *ad-
ministrator de bonis non* of Abram Bellamy, deceased—setting forth
and showing that complainants, on the 4th day of November, 1845,
in the Circuit Court of Jefferson County, obtained against Daniel S.
Graham a judgment for the sum of $798 49-100, and that execu-
tion issued thereon according to law, but that no property of said
Graham could be found liable and subject to be seized under and by
virtue of said execution. That prior to the rendition of said judg-
ment, Graham executed jointly with one George W. Gelzer a mort-
gage on all the property owned by him, to Stephen Woolf and Wil-
liam Blackburn, to secure them against loss or damage, by reason of
their suretyship for said Graham and Gelzer, on their certain pro-
missory notes, to the estate of Abram Bellamy. That, at the Spring
term of the Court, in the year 1843, a decree was made by consent
of said Graham and Gelzer, in favor of William Bellamy, executor
of Abram Bellamy, and Solomon E. Mathers, administrator of Ste-
phen Woolf, and William Blackburn, foreclosing said mortgage, and
subrogating the executor of Abram to all the rights of the said
Woolf and Blackburn, and ordering a sale of the mortgaged property
to pay and satisfy the debt due to the Bellamy estate, and appointing

William D. Moseley, receiver and commissioner of the mortgaged property. That Moseley, immediately after the rendition of said decree, took into his possession the land, steam saw mill and negroes in the mortgage and decree mentioned, and continued to hold them as receiver, by the direction and consent of the executor of Abram Bellamy, until the first Monday in March, 1847, a period of nearly four years—so that the property could not be seized or levied on under execution, thereby, as the bill alleges, hindering, delaying and defrauding other creditors, and particularly complainants, who have been execution creditors of said Graham since November, 1845, in the collection of their just debts. The bill charges that the property mentioned in the decree was not the joint property of Graham and Gelzer, but that each held and owned a part thereof separately. That the rents, issues and profits of the mortgaged property during the four years it was held by Moseley were amply sufficient to pay off and discharge the debt due the estate of Bellamy. That the rents, issues and profits, as complainants have been informed and believe, have been misapplied or squandered by said Moseley ; and that the items in the account of the receiver, in which he gives himself credit for expenses paid in negro hire, &c., are incorrect; and that they are made up by Graham and Gelzer to conceal the fact, that the rents and profits of the mortgaged property have been received by them, and have gone into their own pockets. That, on the said 1st Monday of March, 1847, the said Moseley proceeded to sell, under said decree, enough of the mortgaged property to pay an alleged balance of $7,481 67-100 still remaining due to the estate of Bellamy—when in fact, if the rents and profits of the property had been properly applied, the whole debt would have been extinguished. That in making sale of the property, he sold the individual property of Graham, and that the negroes not sold were the property of Gelzer, and, therefore, not subject to complainants' execution—which, as complainants' allege, was in fraud of their rights, and, therefore, insist that the proceeds of the sale of Graham's property, or so much thereof as may be necessary for the purpose, should be paid over to them in satisfaction of their execution.

The bill also states the receiver not only sold the property of Graham, mentioned in the mortgage, but that he seized and sold three negroes, March, York and one whose name is not known, and eight

mules, not included in the mortgage or decree, and which, com-
plainants say they are informed and believe, were the individual
and separate property of Graham, and subject to their execution ; and
that said Moseley applied the proceeds of the sales of said slaves
and mules to the satisfaction of said mortgage debt. Complainants
allege the death of William Bellamy, executor of Abram Bellamy,
since the rendition of the said decree, and that no proceedings have
been taken, or were taken prior to the sale, to revive it in favor of
William J. Bailey, administrator *de bonis non*.

The bill prays an injunction against Moseley, restraining him from
paying over the proceeds of said sale to the estate of Abram Bel-
lamy, and from delivering up to Gelzer or to Graham, the negroes
mentioned in the decree, and remaining unsold in the custody of
Moseley as receiver, which injunction was granted and issued on the
17th July, 1847.

On the 19th day of March, 1849, Moseley filed his answer, ad-
mitting the statements of the bill as to the mortgage of indemnity
and the decree made thereon in favor of Bellamy, in 1843, but in-
sists that these proceedings were without fraud. That defendant had
become security for the payment of the mortgage debt, with a view
to give time to Graham and Gelzer to pay it by the use of the mort-
gage property. That he was appointed receiver, as alleged in com-
plainants' bill, but that for the purpose of assisting Graham and Gel-
zer in their embarrassment, he having become their security to Bel-
lamy, he left the property in their hands and subject to their direction
and management for the very purpose of enabling them, by time and
the use of the property, to work out of their difficulties and to pay off
and discharge the debt. That the decree referred to in complain-
ant's bill was entered by consent of all parties, and that defendant
was appointed receiver in order that he might control the property,
if circumstances required it, and save himself from loss by reason of
his securityship. That it was well understood at the time of the de-
cree, that Bellamy would not press for his debt so long as there was
a reasonable prospect that Graham and Gelzer would pay the debt
through the means and use of the mortgaged premises. That defen-
dant considered himself, (being security) the only party in danger in
permitting the property to remain in the hands of Graham and Gel-
zer. That he suffered it so to remain having the fullest confidence

in their integrity and honesty, and for the reason also that they were acquainted with all the business touching the management of the mill. That defendant's sole object in becoming in any wise connected with the indebtedness of Graham and Gelzer was to prevent a sale of their property at ruinous rates, entertaining the hope, that by the profits of the mill, they would be enabled to reduce the amount of their indebtedness very considerably, and that if they should be compelled to sell, that they might be able to do so at a future time with much greater advantage. That the sale made by defendant in the year 1847, was made when property had risen in value, no objection to the proceeding being urged by Graham and Gelzer. That defendant was only bound to sell property to pay the debt for the collection of which he was appointed receiver, and for the payment of which he was security. That having done this, he was bound to pay over the balance or surplus to Graham and Gelzer, and to return the property unsold to the party to whom it belonged. That complainants were strangers, of whom and of whose claim he knew nothing in his office of receiver. Defendant filed with his answer an account exhibiting the expenses of the mill and showing the nett proceeds after payment of all expenses during the years 1843, '44, '45, and '46, to be only $1201 60. The answer therefore, denies that the rents, issues and profits of the property were sufficient to pay the debt for which the aforesaid decree was rendered.

The separate answers of Graham and Gelzer are to the same effect as the answer of Moseley, with respect to the matters therein stated. With regard to the negroes York and March, and the mules alleged in complainants' bill to be the property of Graham, the answer of Graham states that they were purchased after the decree rendered in favor of Bellamy, and with the individual means of Gelzer. That he, defendant, had no interest in them.

The following statement of sales of property made under the decree by William D. Moseley, receiver, was filed with his answer:

| Property. | Purchaser. | Amount. | Remarks. |
|---|---|---|---|
| Slave Noah, | W. J. Bailey, | 1205 00 | Paid. |
| " Athur, | Gelzer, | 850 00 | " |
| " Mary, | Gelzer, | 100 00 | " |
| " Samson, | Ross, | 477 00 | " |
| " Nero, | Finlayson, | 375 00 | " |

| | | | |
|---|---|---|---|
| "  March, | Branch, | 655 00 | Note. |
| "  York, | Branch, | 687 00 | Note. |
| Slaves Seley, Maria, and Cloe. } | West, | 600 00 | Paid. |
| Steam mill, | Moseley, | 2105 00 | Note. |
| One mule, | Powell, | 90 00 | Paid. |
| "    " | Gamble, | 55 00 | " |
| "    " | Anderson, | 81 00 | " |
| "    " | Gamble, | 69 00 | " |
| "    " | Gamble, | 71 00 | " |
| "    " | Stephens, | 62 00 | " |
| "    " | Stephens, | 63 00 | " |
| "    " | Andrews, | 38 50 | " |

Total,    -    -    -    - . $7,583 50

The notes given by Moseley to Bellamy, the one for the sum of $2,411 90-100, the other for the sum of $4,542 40-100, on both which was endorsed a statement to the effect that they were given as security for a debt due to William Bellamy, executor, from D. S. Graham and G. W. Gelzer, were also on file as proofs in the cause.

At a Circuit Court for the County of Leon on the sixth day of November, 1849, this cause coming on to be finally heard, upon bill, answers, exhibits and proofs on file—it was ordered, adjudged and decreed, that the injunction heretofore granted in this case, be dissolved, and that the bill be dismissed, &c.

From which decree complainants appealed.

*Branch,* for appellants :

1st. The law will not allow a judgment creditor to use his judgment as a cover to keep off other creditors. The language of the statute (Thomp. Dig., 215) is, " and every bond, note, contract, *suit, judgment and execution,* which shall hereafter be had, made, &c." Decrees in Chancery stand on the same footing as judgments at law. Thomp. Dig., 461.

All the facts of this case show that it is a decree or judgment, or suit, within the statute of Florida, to hinder, delay and defraud creditors. The fact that Bellamy, or rather Moseley, who seems to have been in fact both judgment creditor and receiver and commissioner, kept the property about four years without making a sale as directed

in the decree, and permitted it to remain all the while in the posses-sion *and use* of the defendants, allowing them to receive the *rents and profits*, *was a fraud* on the junior execution in favor of the com-plainants in this suit, which will deprive the decree of its prior lien, and postpone it to the junior execution in favor of complainants in this case.

But there is another fact which seems to be conclusive on this head. The answers of Moseley, Graham, and particularly of Gelzer, admit and claim that it was *an arrangement made with the view and for the purpose of giving the defendants in the decree an opportunity to work out the debt.* That the decree was taken with this view, and Moseley appointed receiver and commissioner with this view. It cannot be presumed the Court rendering the decree was cognizant of an arrangement which proposed thus to use its powers. A decree or judgment rendered *not* for the purpose of *enforcement*, would make a mockery of the proceedings of our Courts of justice, bring them into contempt and bring its mandates down to be regarded as merely " *brutum fulmen.*" In the legitimate exercise of its powers, it ren-dered the decree and appointed a receiver and commissioner to carry that decree into effect, who had no right to evade it in order to exer-cise any feelings of *benevolence* or *philanthropy* towards the defen-dant. Berry vs. Smith, 3 Wash. C. C. R., 62. Twyne's Case and notes in Smith's Leading Cases.

In the above case of Berry vs. Smith, Judge Washington says, " In consequence of the delay in the due execution of the writ, the time has been so long as to warrant *a presumption* of a design to protect the property, which, in contemplation of law, amounts *to a fraud*, however *innocent and praise worthy*, on the ground of *benev-olence*, the motive might be which induced it."

In this case, it is not a presumption, but a fact boldly avowed and relied upon by the defendants in their answers.

2d. That the decree having directed *rents, issues and profits* to be applied " *exclusively*" to the payment of the mortgage debt, the pay-ment of them over to the defendants for about four years, was in vio-lation of the decree, and a fraud upon the rights of the complainants. That had they been so applied, the mortgage debt would have been fully paid thereby, and the *separate* and *individual* property of Gra-ham been left liable to be taken under complainants' execution.

By statement furnished by the receiver, Moseley, and appended to bill, and which is admitted to be correct, it appears, that the proceeds of the mill amounted to - - - - $14,899 60
Sale 1st March, 1847, - - - - $7,481 67

Total receipts by receiver, - - - - $22,381 27
From this, deduct the mortgage debt, which on
1st March, 1847, amounted to, - - - $8,707 90

Leaving balance in hands of receiver of - $13,673 37

This large balance of $13,673 37, is sought to be absorbed by *expenses*, not one item of which does the receiver say is *correct*, or was paid by him, or even known to him, and to support which not a single *voucher* is produced, and every item of which is without *dates*, yet the Court below allowed them.

If the Court will take the trouble to examine this *formidable* list of expenses, it will be irresistibly forced to the conclusion that they have been trumped up for the occasion. The fact that $13,673 37 · of *expenses* were incurred by a receiver appointed by the Court to sell specified property and collect therefrom $8,707 90, if not evidence of bad management, at least too plainly indicates the nature of the whole transaction, to be easily mistaken. The Court will observe that no authority is shown under which the receiver and commissioner had the right to expend one dollar. The decree directs the proceeds, *the rents and profits*, to be applied exclusively to the payment of the mortgage debt. A receiver has no powers not expressly granted him in the order appointing him. For powers of a receiver, see 2 Story Eq., 134–5.

3d. The reason assigned in all the books for the appointment of a receiver, is, that the fund or property may be taken out of the hands of the debtor and a waste thereof prevented. It was a fraud, therefore, to permit it to remain in the hands of the defendants. 2 Story Eq., 134–5.

4th. Complainants contend that the decree became null and void, and in fact *was satisfied* by Bellamy's taking the notes of Moseley, the receiver and commissioner, for the debt—(see testimony of Budd, which contains copies of notes,) and that neither Moseley nor Bellamy had a right to keep the same alive so as to hold the property,

and that he had no right to sell under the same. Noy's Maxims—Reed vs. Pruynn, 7 John. R., 426. Sherman vs. Boyce, 15 John. R., 443. Martin vs. Condy, 1 How. S. C. R., 417.

5th. That when a creditor has two funds out of which to make his debt, and another has only one, a Court of Equity will compel him having the two funds to resort to that *first* on which the other has no claim. 1 Story Eq., 588.

In this case there were *three funds* or species of property out of which to make the mortgage debt. 1st. The partnership property of Graham and Gelzer. 2d. The individual and separate property of Gelzer contained in the mortgage. 3d. The individual and separate property of Graham contained in the mortgage.

As these three funds confessedly amount to much more than is necessary to pay the mortgage debt, the *two first* mentioned classes should have been exhausted before *the third* (which alone is responsible for debt of complainants) was taken. Instead of pursuing this equitable rule, the order has been reversed, and the individual and separate property of Graham has been exhausted, leaving most of that belonging to Gelzer individually, untouched. In this way complainants have been deprived of all remedy, and their debt made a total loss.

*Archer*, for appellee.

The bill alleges a judgment in November, 1845, in favor of complainants against Graham. This is admitted by defendant. Also, that in May, 1843, judgment or decree was rendered upon a mortgage executed by Graham and Gelzer. The decree is exhibited, see page 10. The bill again alleges that the receiver, under instructions from William Bellamy, held the mortgaged property nearly four years, so that the same could not be levied on by complainants, and that such proceedings hindered and delayed creditors. The answers satisfactorily explain the conduct of the receiver and of Bellamy, and deny the fraud, and no proof is adduced to the contrary.

The arrangemant intended by the decree was virtually this, that the mortgagors, notwithstanding the foreclosure, should continue in possession, and be allowed further time to redeem the mortgage of Bellamy's estate. This was no fraud upon Barnard, Adams, & Co. On the contrary, it was to their benefit. If Graham actually got

$14,000, which should have been paid to Bellamy's estate, but which was not paid, he is the better able to pay Barnard, Adams, & Co. It is clear that the delay was for the benefit of the debtors, to assist them and improve their means, and consequently operated rather to the benefit of their other creditors.

The bill further alleges that Noah and Arthur belonged to Graham, and this is admitted ; also, that the land and mill belonged to Graham, but this is denied. These last were the joint property of Graham and Gelzer. The bill also alleges and admits that the other slaves belonged to Gelzer. Complainants insist that including the property of Graham and Gelzer in one mortgage is a fraud. But no fraud in fact is proved, and certainly cannot be inferred from the mortgage.

The bill then charges that the rents and profits of the mill for four years were sufficient to pay the mortgage debt. This is denied by the answers, and no proof to the contrary is adduced. The bill refers to Moseley's accounts to prove the allegation last mentioned, and charges that the credits claimed are " vamped up" by Graham and Gelzer for the occasion. But no proof is offered to sustain any part of the complainants' charges and insinuations.

The bill then charges that Moseley sold in March, 1845, all of Graham's property and only a part of Gelzer's, and that he should have raised the money exclusively out of Gelzer's· property, so as to leave Graham's property subject to the execution of complainants. But it seems that more of Gelzer's property was sold than of Graham's, and certainly there is no justice in the position that all of Gelzer's property should have been sold to pay the whole debt when there was property of his joint debtor equally bound.

The bill charges that York, March, another slave and the mules belonged to Graham, and that Moseley took them and sold them, although they were not a part of the mortgaged property. This charge, if true, would only show that Barnard, Adams, & Co. had a lien on this property under their execution, and that they were very negligent in not pressing their execution against the property. But unfortunately for complainants, the answers show that York and March and the mules belonged to Gelzer, and that he sold them in preference to and in substitution of his slaves named in the mortgage.

The foregoing covers all the material allegations of the bill. They

are sufficiently denied by the answers, and the cause was set down for hearing and finally heard as to all the defendants but Bailey, upon bill and answers and papers on file. What has become of Bailey's interest? who represents him does not appear. Indeed as to him, the case is still before the Circuit Court.

It was insisted in argument that Moseley's notes to Bellamy, given as collateral, amounted to a *payment* and discharge of the mortgage. This is not averred in the bill, but if this be true, it is too clear for argument that Barnard, Adams, & Co. had a complete remedy at law. The incumbrance being removed by the satisfaction, Graham's property was left subject to levy.

It was also insisted that the receiver being under injunction, had no right to pay over the proceeds of the sales to the mortgage debt, or to Graham and Gelzer; but the sale was on 1st March, and the payments were made on *that day*. The injunction was issued and served in July—Moseley paid Bailey, administrator, on 1st March, out of the sales, the following sums:

$3,822 50—81 00—233 50—2,105 00—Total, $6,241 50.

Whole amount sales,      -      -      -      $7,583 50

Balance, being bids for York and March,      $1,342 00
Moseley also paid on the balance of      $1,001 60
Nett profits of the mill the amount of      720 00
Balance profits mill in hand when injunction was served, and not more than enough to pay expenses, - - $281 60.

So that, before the injunction was served, all the moneys beyond expenses were paid over, except the bids for York and March. These slaves belonged to Gelzer. What equity has Barnard, Adams, & Co. against that fund?

But suppose, for the sake of argument, that on the 1st March after the sale, Moseley really had $14,000, the profits of the mill, and $8000 the sales of the property, was it not his duty to reserve enough to pay Bailey, as administrator, and to return the balance to Graham and Gelzer, or to the Court? If so, the surplus is exactly in the proper hands—Moseley would have no right to pay any but the mortgage debt.

But if Barnard, Adams, & Co. had any equities against the funds

in the receiver's hands, they have been so negligent as to have lost their claim. They had a judgment, an execution, made no complaint, filed no bill, their attorney was at the sale, became a bidder, and he and they laid by until the proceeds, excepting the bids for York and March, were paid over. And four months afterwards they file a bill of complaint. To sanction such proceedings would be to advertise premiums for negligence, and to entrap diligence and punctuality.

So far as the receiver is concerned, and the fund in his hands, the bill cannot be sustained, for a receiver is but the agent and representative of the Court, and cannot sue or be sued without the permission and sanction of the Court.

HAWKINS, J.

It is contended that the decree made in this case, to which Bellamy, executor of Abram Bellamy, Mathers, Blackburn, Graham, Gelzer, and others, were parties, is fraudulent, as tending to defeat, delay and hinder creditors. If this was the case, the duty of the Court would be a very plain one—but we cannot see that there was any fraud in the transaction. It was arranged by the decree that Gelzer and Graham should deliver the possession of the real estate, mill property and slaves and increase to W. D. Moseley, the receiver and commissioner appointed by the Court, to be sold by him, after thirty days' notice, as he may be directed by complainants, or either of them, and the proceeds to be applied to the Bellamy debt, and that in the meantime, Moseley was to receive, take charge of and manage the concerns of the mill, the issues and profits of which were to be exclusively applied to the discharge of the debt due to Bellamy.

Moseley did not take actual possession of the mill for the purpose of working it, but left it in the possession of Gelzer and Graham to be used by them. The possession of these individuals must be regarded as the possession of Moseley, and they could have been compelled to attorn to him if he had deemed it necessary. It has been seen by the terms of the decree, that the property could have been sold at any time at the instance of Bellamy. Moseley, for the purpose of procuring time for Gelzer and Graham, to enable them to pay their debt to Bellamy, becomes security for the amount of the mortgage debt, and by way of indemnity to him, and security to Bellamy, the

decree was made.   The property was left in the possession of Graham and Gelzer, because they understood the management of the mill, and Moseley trusted to their integrity and honesty to manage the mill property, and hoped, he says, that the receipts of the mill would contribute to reduce the debt due by Graham and Gelzer. That in 1847, property having risen in value, the property, by consent of all parties, was sold.

We cannot see any fraud in this decree, or any thing calculated to hinder or defeat creditors, but it seems merely an arrangement for the purpose of enabling debtors to liquidate their debts by the retention and use of, rather than by sale of the property.   Indeed the tendency of the arrangement was rather intended to benefit the other creditors of Graham by the prevention of a summary sale of his property under execution, and in ratio to the amounts paid Bellamy out of the profits of the property mortgaged, to that extent would the chances of the creditors of Graham be increased.   Of course a Court of Equity would not permit a fund to be locked up for the purpose of securing it from creditors, even under a decree of a Court, but a party complaining of such a procedure, would have an adequate remedy by an appeal to the equitable side of the Court, which on proper showing, would compel the parties to that decree, to proceed and sell or do what might be deemed equitable.   But no steps are taken until the property mortgaged is sold.   It is alleged in the bill and urged in argument, that the profits of the mill for four years were sufficient to have paid off the debt due to Bellamy.   This is negatived by the answers, and the account of the profits, expense, &c., if not surcharged or falsified by the complainants, and therefore, we must take it as true and correct.   We do not concur with the counsel for complainants, that it was the duty of Moseley to have sold exclusively the property of Gelzer.   It was a joint debt, and their joint property as contained in the mortgage, was the property which should have been sold.   The record shows, too, that more of Gelzer's property than Graham's was sold.   Noah, Arthur, and Mary were the property of Graham, and the rest of the negroes, seven in number, were the property of Gelzer, as well as the mules, and that the mill property was owned jointly.   The complainants show no ground for a subrogation to the rights of Graham, for the above reason, and further that Gelzer states in his answer, that Graham owes about three thousand dollars.

It is contended that the note given by Moseley to Bellamy extinguished the mortgage. There is no allegation of this in the bill, but admitting this, the property of Graham would have been released from the lien of the mortgage and the effect of the decree, and the complainants should have levied their execution upon the property of Graham, and this question could have been settled at law upon a trial of the right of property. It was certainly the duty of Moseley to have paid the debt to the estate of Bellamy, and as to the surplus, if any, to have paid it into Court, to abide its final or further order. But whatever steps might have been legally taken by complainants were not taken until the fund was paid over, excepting the amount brought by the sale of York and March, and these negroes were the property of Gelzer and not Graham. Whatever equitable rights complainants may have had upon the funds in the hands of Moseley, we think clearly waived by their negligence.

No bill was filed until the transaction was closed, and as before remarked, if the individual property of Graham was liable to their execution, they should have levied it upon that property. With these views, we think the decree of the Circuit Court should stand. It is therefore ordered, adjudged and decreed, that the decision of the Court below be affirmed, and that the bill of complainants be dismissed with costs.